**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

FSI International, Inc.,

Plaintiff,

v.

Brandon Shumway, an individual,

Defendant.

Civil No. 02-402 (RHK/SRN)
**MEMORANDUM OPINION AND ORDER**

---

Marko J. Mrkonich and Chad W. Strathman, Littler Mendelson, P.C., 3110 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota, for Plaintiff.

Edward B. Magarian and Michelle S. Grant, Dorsey & Whitney, L.L.P., Minneapolis, Minnesota, for Defendant.

---

## Introduction

Before the Court is Plaintiff FSI International, Inc.'s ("FSI") Motion for a Preliminary Injunction or, in the Alternative, Temporary Restraining Order. Defendant Brandon Shumway worked as a sales representative for FSI for nineteen years. Six years ago, Shumway signed an Employment Agreement with FSI that contained various non-compete and non-solicitation provisions. In early February of 2002, Shumway tendered his resignation from FSI, effective February 22. Shumway told his immediate supervisor that he had accepted a job with Solid State Equipment Corporation ("Solid State"). That position was to start February 25, 2002.



FEB 26 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

FSI seeks an order enjoining Shumway from (a) working for Solid State, (b) soliciting customers of FSI, and (c) disclosing or utilizing trade secrets or other confidential information owned by FSI. Both parties have appeared in this matter and the Court has received and reviewed memoranda and affidavits submitted both in support of and in opposition to the pending motion. A hearing was held on February 25, 2002 before the undersigned. The following constitutes the Court's findings of fact and conclusions of law as required by Rules 52(a) and 65 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Plaintiff's Motion is denied.

**Background**

FSI is a Minnesota corporation having its principal place of business in Chaska, Minnesota. FSI is a global supplier of processing equipment used to manufacture microelectronics, including semiconductor integrated circuits and thin film heads for the computer hard drive industry. (Becker Aff. ¶ 3.) FSI's Micro-lithography Division represents approximately one half of FSI's revenues. (Becker Supplemental Aff. ¶ 4.) The Micro-lithography Division markets products that perform photoresist processing of semi-conductor wafers. (Id.) FSI's Surface Conditioning Division markets microelectronics cleaning products that remove contamination and unwanted films from the wafers. (Id. ¶ 5.) Some of the products in the Surface Conditioning Division process multiple wafers at a time, whereas other products process wafers one at a time. (Id.)

FSI hired Shumway as an account manager in 1983. (Malis Aff. ¶ 9.) Although

Shumway was hired in Minnesota, he later moved to Massachusetts to serve accounts in the eastern United States. (Id.) Shumway presently resides in Franklin, Massachusetts.

On about February 2, 1996, after thirteen years of employment at FSI, Shumway executed an Employment Agreement ("the Agreement") with FSI. The Agreement obligated Shumway to maintain in strictest confidence any "Confidential Information"[1] he learned as a result of working for FSI. (Compl. Ex. A ¶ 2(a).) The Agreement further required Shumway to maintain in confidence any "Customer Information"[2] he obtained.

---

[1] The Employment Agreement defines "Confidential Information" to mean

> certain proprietary information maintained in confidence by the Company as intellectual property, trade secrets, or otherwise, including but not limited to information relating to (i) the Company's finances, processes, products, services, research, and development, and (ii) its manufacturing, purchasing, accounting, engineering, designing, marketing, merchandising, selling, distributing, leasing, and servicing systems and techniques; it also includes plans or proposals with regard to any of the foregoing, whether implemented or not. All information originated by Employee, or disclosed to Employee, or to which Employee otherwise gains access, during the period of Employee's employment with FSI that the Employee has reason to believe is Confidential Information, or that is characterized or treated by the company as being Confidential Information, or that would be of economic value to a third party, shall be presumed to be Confidential Information.

(Compl. Ex. A at 1-2.)

[2] The Employment Agreement defines "Customer Information" to mean "information relating to Customers' operations, processes, products, and research and development and to Customers' manufacturing, purchasing, and engineering systems and techniques." (Compl. Ex. A at 2.) "Customers" includes "any firm, person, corporation, or other entity (i) to whom or to which the Company has sold, distributed, or leased its products or services, or (ii) whom or which the Company has solicited for sales,

In addition, the Agreement required Shumway, both during his employment at FSI and for a period of one year after termination, not to sell, distribute, or lease a "Competing Product,"[3] directly or indirectly, to a customer with whom he had communicated during the last two years of his employment with FSI. (Id., ¶¶ 3(c), 3(d).) Furthermore, Shumway agreed, for a period of one year after the end of his employment with FSI, from serving as

> a director, officer, manager, trustee, partner, employee, independent contractor, agent, or consultant, or otherwise become active or involved in the management, operation, or representation of a business or other enterprise that is engaged in or about to engage in selling, marketing, producing, distributing, leasing, designing, or developing a Competing Product . . .

(Id. ¶ 3(b)(i).)

Shumway was a successful account manager for FSI. (Becker Aff. ¶ 6; Malis Aff. ¶ 12.) While employed with FSI, Shumway actively marketed products from FSI's Micro-lithography and Surface Conditioning divisions. (Becker Supplemental Aff. ¶ 3.)

---

distribution, or leasing of its products or services, whether directly or indirectly, and whether by or through employees of the Company or affiliated sales organizations." (Id.)

[3] The Employment Agreement's definition of "Competing Product" has two parts, one for the period during which Shumway was an employee of the Company and one for the period after Shumway's employment with the Company ended. For the latter time period, "competing product" means "any product or service that competes with or will compete with any product, product line, or service that is sold, marketed, produced, distributed, leased, or under development by the Company with respect to which Employee performed services of any kind or nature" during the twenty-four months prior to the end of his employment with FSI. (Compl. Ex. A at 1.)

Shumway's primary account responsibility was to serve IBM on a national basis. (Malis Aff. ¶ 9.) During his nineteen years with the company, Shumway gained knowledge of FSI's pricing structures and marketing strategies. (Id. ¶ 13.) Shumway also participated in sales meetings in Minnesota to discuss new products, pricing models and sales strategies, the most recent being in November 2001. (Id.)

On February 7, 2002, Shumway received a letter from Solid State offering him a job as a "Technical Account Manager" for Solid State's "Eastern Region Territory." (Shumway Aff. Ex. A.) Solid State described Shumway's new job as follows:

> Your responsibilities will include generating new business, maintaining existing accounts, and ensuring customer satisfaction with [Solid State's] full line of single wafer wet processors and hermetic package sealing equipment, in addition to other duties relating to your position as assigned by [Solid State].

(Id.) Prior to receiving this offer, Shumway had provided Solid State with a copy of his 1996 Employment Agreement with FSI. Solid State wrote Shumway that "[a]fter careful analysis and in reliance on representations made by you, we agree with your view that our single wafer processing tool does not compete with any of the bulk wafer processing tools marketed by FSI."[4] (Id.)

---

[4] Solid State further told Shumway that it had

> considered the fact that FSI does not have a single wafer processing tool and, in fact, [Solid State] even discussed a potential OEM relationship with [Solid State] to fill this area of FSI's product line.

(Id.)

On February 8, 2002, Shumway tendered his resignation to FSI, effective February 22, 2002. (Malis Aff. Ex. A.) In his resignation letter, Shumway said that he had accepted a new position with another company. (Id.) Shumway's direct supervisor, David Malis, sent Shumway an e-mail message acknowledging receipt of Shumway's resignation letter. (Shumway Aff. Ex. B.) In that e-mail, Malis stated that,

> [a]s part of normal closure, we would like to have a memo from you indicating more details about your new position with respect to your employer, your position and responsibilities, your accounts and the products and applications you will be selling. As I stated earlier, we don't anticipate there being any issues or conflicts.

(Id.) Shumway verbally informed Malis that he intended to begin working immediately as a sales representative for Solid State and that his territory for Solid State would include all states east of the Mississippi River. (Malis Aff. ¶ 16.)

On February 13, 2002, FSI sent letters to both Shumway and Solid State, advising them of the restrictive covenants in the Agreement and FSI's intention to enforce them. (Compl. Exs. B & C.) On February 14, 2002, Solid State responded through counsel, acknowledging that Shumway had been hired by Solid State and stating its opinion that Shumway's employment with Solid State would not violate the Agreement. (Compl. Ex. D.) Solid State also indicated through counsel that it had "carefully defined Mr. Shumway's position to assure that he does not use any proprietary information obtained during the course of his employment with FSI in connection with his duties for [Solid State]." (Id.) Furthermore, Solid State told FSI that it had instructed Shumway in

writing "not to retain or use in any way customer lists, financial information, product information, price lists or other proprietary information of FSI's."[5] (Id.) On February 19, 2002, Shumway also wrote to FSI and stated that Solid State had instructed him not to use or retain any of FSI's proprietary information and that his new position had been "carefully defined" to assure that he would not use any proprietary information. (Compl. Ex. E.) This action followed.

**Analysis**

Whether a temporary restraining order should issue depends on an evaluation of the following factors. (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunctive relief will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. See Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). "When applying the Dataphase factors, as they have come to be called, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999) (internal quotation marks and citations omitted). The party requesting the restraining order bears the "complete burden" of proving all the factors listed above. Gelco Corp. v.

---

[5] FSI alleges that it requested further information from Solid State by a letter dated February 15, 2002, and that Solid State has not to date responded. (Compl. ¶ 20.)

Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987). The Court begins with FSI's likelihood of success on the merits, which is frequently considered the most important of the Dataphase factors. See S & M Constructors Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir.), cert. denied, 506 U.S. 863 (1992).

**A. Likelihood of Success on the Merits**

FSI seeks an temporary injunction ordering Shumway to comply with the Agreement's confidentiality requirements and the non-competition and non-solicitation provisions, contending that there is a strong likelihood of success on the merits of its breach of contract and misappropriation of trade secrets claims. Shumway responds that FSI has failed to meet its burden on this factor with respect to either claim. On the breach of contract claim, Shumway argues that FSI cannot establish that the restrictive covenants in the Agreement are supported by adequate consideration or were bargained for. Shumway further argues that there is no evidence of a breach because the product lines sold by FSI and Solid State are not competitive. With respect to the trade secrets claim, Shumway argues that FSI has not safeguarded what it claims to be "confidential information" and that, in any event, FSI has not established a high degree of probability that there will be an "inevitable disclosure" of the information. The Court starts with the breach of contract claim.

**1. Breach of Contract Claim**

For FSI to succeed on the merits of its claim that Shumway has breached the non-

competition and non-solicitation clauses in the Agreement, it must establish that those provisions are valid and enforceable against Shumway and that they have been violated. The Agreement provides that the rights and obligations of the parties are to be governed by Minnesota law, (Compl. Ex. A ¶ 13), and both parties have relied on Minnesota cases in arguing the validity and enforceability of the Agreement. Applying Minnesota law, the Court starts with the question of whether the restrictive covenants are valid.

**a. The validity of the restrictive covenants**

The restrictive covenants in the 1996 Agreement were not entered into at the outset of Shumway's employment relationship with FSI. Because they are not incident to Shumway's initial oral employment contract, the covenants must be supported by independent consideration. See National Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740 (Minn. 1982). "The adequacy of consideration for a noncompetition contract or clause in an ongoing relationship should depend on the facts of each case." Id. at 741 (quoting Davies & Davies Agency, Inc. v. Davies, 298 N.W.2d 127, 130 (Minn. 1980)). "The mere continuation of employment can be used to uphold coercive agreements, but the covenant must be bargained for and provide the employee with real advantages." Freeman v. Duluth Clinic, Inc., 334 N.W.2d 626, 630 (Minn. 1983).

FSI has identified three items of consideration supporting the restrictive covenants. The first, recited in the Agreement itself, consists of Shumway's "participation in one or more of FSI's 1996 incentive or stock option plans." (Compl. Ex. A at 2.) The second,

also found in the Agreement, is a promise by FSI to pay Shumway – for up to twelve months – 75% of his average monthly base pay, bonuses and commissions for each month that Shumway is unemployed if, despite "conscientiously and diligently seek[ing] other employment," he "is unable to obtain employment consistent with his abilities and education solely because of" the non-compete and non-solicitation clauses.[6] (Compl., Ex. A. ¶ 4(a).) Finally, FSI alleges that Shumway's continued employment was adequate consideration. The Court considers each in turn.

***(1) Participation in the 1996 incentive plan***

In late 1995, FSI required its account representatives to sign an Agreement containing the restrictive covenants at issue here. (Malis Aff. ¶ 20.) In exchange for the restrictive covenants, the Agreements recite that the employee signing the Agreement received the right to participate in "one or more of FSI's 1996 incentive or stock option plans." (Compl. Ex. A at 2.) FSI describes the incentive plan as "a plan for payment of incentives and commissions, which was variable, but at times represented an additional amount totaling approximately at least 20%-200% of an account manager's base salary." (Malis Aff. ¶ 11.)

Shumway argues that participation in the 1996 incentive plan cannot constitute independent consideration because he had always participated in such plans since he

[6] The average monthly base salary, bonuses, plus commissions is determined by looking over a twenty-four month period prior to the termination of employment.

began working at FSI. Shumway contends that an increase in pay can provide independent consideration for a non-competition agreement only where it is attributable to the employee's agreement to the restrictive covenants, relying on Sanborn Mfg. Co. v. Currie, 500 N.W.2d 161, 163-64 (Minn. Ct. App. 1993). Shumway argues that his participation in the 1996 compensation program cannot be attributed to signing the Agreement because, looking back to the compensation structure established when Shumway began working at FSI, he has always been paid a base salary plus an incentive package. (Shumway Aff. ¶ 15.) Shumway further contends that, after signing the Agreement, his total compensation actually declined each year after 1995 (with the sole exception of 2000). (Id.) Therefore, he received no actual increase in compensation or other "real benefit" from agreeing to the restrictive covenants.[7]

Based on the record before it, the Court concludes that FSI has failed to establish that, as a result of signing the Agreement, Shumway received additional compensation that was not part of his employment contract when he was initially hired in 1983. Furthermore, there is no dispute in the record that the 1996 incentive program failed to positively impact Shumway's compensation. (See Shumway Aff. ¶ 15.) Thus, the consideration recited at page 2 of the Agreement is not independent of the existing

---

[7] Shumway further argues that the restrictive covenants were not "bargained for"; FSI presented the Agreement to him and told him that he had to sign it, giving Shumway no opportunity to negotiate any of the terms in the Agreement. (Shumway Aff. ¶ 14.) It appears however, that several months went by before Shumway signed the Agreement. It is unclear whether, during that time, he made any effort to negotiate the terms.

employment relationship nor does it constitute a "real benefit" given in exchange for the restrictive covenants.

### *(2) The promise to pay 75% of average monthly compensation*

FSI contends that consideration can be found in the promise it made in the Agreement to pay Shumway up to 75% of his average monthly pay for up to one year if he was unable to obtain employment because of the covenant not to compete. FSI argues that the offer to pay Shumway a portion of his salary if he could not find alternative work due to the restrictive covenant was an independent benefit that was not part of his employment contract and, therefore, is sufficient consideration to support the restrictive covenants. In support of this proposition, FSI relies on Modern Controls, Inc. v. Andreadakis, 578 F.2d 1264 (8th Cir. 1978).

In Modern Controls, the Eighth Circuit reversed a district court's denial of a preliminary injunction on the grounds that the lower court had erred in concluding that the restrictive covenants were not supported by independent consideration. The employer, Modern Controls, had promised to pay Andreadakis' monthly base pay for a period of two years if he was "unable to obtain employment consistent with [his] abilities and education solely because of the provisions of this [covenant not to compete]." Modern Controls, 578 F.2d at 1268 n.7. Acknowledging that the Minnesota Supreme Court had not yet decided whether continued employment alone was sufficient consideration for a covenant not to compete, the Eighth Circuit concluded that it need not

address that issue because the covenant not to compete "was supported by something more than the mere continuance of employment." Id. at 1268. Relying on case law from the Second Circuit, the Modern Controls court determined that the covenant "was supported by an obligation on the part of Modern Controls to pay Andreadakis his base pay for two years if he could not find suitable work in another field." Id. Although Modern Controls had the option of releasing Andreadakis from his obligations under the restrictive covenants instead of paying him a monthly salary, that option did not render the promise insufficient as consideration because the option "was not wholly unlimited." Id. The Eighth Circuit observed that "Andreadakis' promise not to compete for two years and Modern Controls' promise to pay him his base salary for two years are both conditioned on Modern Controls' decision to enforce the covenant and both promises must either be performed together or not at all." Id.

FSI's "promise" to pay Shumway is not identical to (and is, in fact, distinguishable from) the promises discussed in Modern Controls. FSI requires that Shumway "conscientiously and diligently seek other employment," (Compl. Ex. A ¶ 4), and to give FSI a detailed written report for each month of unemployment, describing his efforts to obtain another job. (Id. ¶ 4(b).) FSI determines whether Shumway has "conscientiously and diligently sought other employment" and, if it concludes he has not, it may suspend the monthly payments. (Id.) Any suspended payments are considered forfeited. (Id.) Furthermore, when asked at the motion hearing what would constitute "other

employment" for purposes of the provision -- for example, if Shumway were able to secure a job flipping hamburgers, would he be expected to take it -- Plaintiff's counsel responded that it would be a matter of contract interpretation. Thus, FSI's "promise" to pay Shumway is not based on a simple decision of whether to enforce the restrictive covenants; rather, it is based on subjective standards of sufficient "diligence" and "conscientiousness" and provides no clear guidance for when the right to receive payment under the Agreement has been triggered. Such unfettered discretion in FSI's hands does not render the "promise" to pay Shumway three-quarters of his average monthly income sufficiently definite to be deemed consideration for the restrictive covenants.

***(3) Continued employment at FSI for six years.***

FSI also argues that Shumway's continued employment was adequate consideration because, during the six years after Shumway signed the Agreement, it "provided him with access to trade secrets to improve his performance, and provided him with substantial benefits and salary." (Mem. Supp. Mot. for Prelim. Inj. at 11 n.2.) There is no evidence, however, that the "substantial benefits and salary" paid to Shumway after February 2, 1996, were anything other than the salary and benefits he was already entitled to under his employment contract. See Sanborn Mfg. Co., 500 N.W.2d at 163-64. Nor does it appear that FSI increased Shumway's responsibilities or "promoted" him in exchange for his agreement to the restrictive covenants. Cf. Jostens, Inc. v. National Computer Sys., Inc., 318 N.W.2d 691, 703-04 (Minn. 1982) (holding that noncompete

agreements lacked consideration because employer did not provide employees with future benefits, raises, or promotions). As for providing training to Shumway, the Court finds no evidence to suggest that FSI's obligation to provide training did not pre-exist the restrictive covenants. Cf. National Recruiters, Inc., 323 N.W.2d at 741 (holding that employee training did not constitute independent consideration because the training was part of the employees' pre-existing oral employment agreement and did not provide the employees with a "real advantage"). Finally, the evidence concerning "access to trade secrets" tends to show that all of FSI's account managers were provided such "access" in order to improve their sales performance and had been given such information prior to signing the Employment Agreement. (See Malis Aff. ¶ 7.) These other items do not constitute independent consideration for the restrictive covenants Shumway gave to FSI.

Based on the foregoing, the Court concludes that FSI has failed to meet its burden of establishing a likelihood of success on the issue of whether the restrictive covenants in the Agreement were supported by independent consideration and, hence, valid. That conclusion alone weighs against granting a preliminary injunction, but the Court goes on to consider Shumway's second argument concerning the breach of contract claim – whether FSI can establish an imminent breach.

**b. Violation of the restrictive covenants**

Under Minnesota law, non-competition and non-solicitation agreements -- being agreements that partially restrain trade -- are strictly construed and are enforceable only to

the extent reasonably necessary to protect a legitimate business interest. See Webb Pub. Co. v. Fosshage, 426 N.W.2d 445, 450 (Minn. Ct. App. 1988) (citing Bennett v. Storz Broadcasting Co., 134 N.W.2d 892, 899-900 (Minn. 1965)). The Minnesota Supreme Court has recognized that an employer has a legitimate interest in protecting its business against "the deflection of trade or customers by the employee by means of the opportunity which the employment has given him." Bennett, 134 N.W.2d at 898. Through affidavits, Shumway contends that FSI and Solid State manufacture and sell products that are not directly competitive. Thus, there is no danger of deflecting trade or customers.

Shumway asserts that, while FSI manufactures some single-wafer equipment (i.e., equipment that completes steps in the creation of a semi-conductor, one wafer at a time), it does not manufacture products that compete with the single substrate wet processing equipment that Shumway intends to sell for Solid State (i.e., equipment that cleans and conditions the surface of a semi-conductor wafer). (Shumway Aff. ¶¶ 2, 3; Godshall Aff. ¶¶ 4-5, 7-8; Shumway Supplemental Aff. ¶¶ 2, 3.) Shumway avers that Solid State serves primarily third-tier, lower through-put customers that cater to single-wafer processing, which is a different market than the multi-processing, higher through-put capability of FSI's products. (Shumway Aff. ¶ 7.) Shumway also presented unrebutted evidence that the equipment sold by FSI and Solid State occupy greatly different price brackets: Solid State's products are generally priced at between $50,000 and $400,000, whereas FSI's products are generally priced at between $500,000 and $2.5 million. (Godshall Aff. ¶¶ 6,

9; see also Shumway Suppl. Aff. ¶ 2.) Ultimately, customers shop for the equipment having the manufacturing capacity they require. (Shumway Aff. ¶ 5.) Therefore, Shumway asserts that, based on his experience selling to the microelectronics manufacturing industry, the machines manufactured by FSI are not competitive with the machines manufactured by Solid State. (Shumway Aff. ¶ 4.)

FSI responds that the equipment it manufactures ultimately achieve the same objective as the equipment manufactured by Solid State -- the completion of certain steps in the creation of a semi-conductor wafer. Thus, because they end up with the same result, they are directly competitive. FSI has also submitted evidence that it is developing and intends to market products that will directly compete with Solid State's single-wafer wet processors. (Becker Supplemental Aff. ¶¶ 6-9.) FSI is currently developing and marketing these single-wafer wet processing products both on its own and through a joint venture with a Japanese company called mFSI, Ltd., in which FSI has a 49% ownership interest. (Id. ¶ 6.) Becker and Shumway have discussed FSI's plans to expand its single-wafer wet processing component in the Surface Conditioning Division's product line, and Shumway has attended FSI leadership conferences during which these strategies were presented. (Id. ¶ 9.) Shumway responds that, while he understands that FSI has a general goal to offer a full line of surface conditioning equipment, including single-wafer wet processing, he is not aware of any attempts to market such equipment or that FSI has even developed such a line. (Shumway Supplemental Aff. ¶ 4.) In addition, Shumway

avers that, aside from a general knowledge about FSI's goal to develop a full line of surface conditioning equipment and about the existence of a relationship between FSI and mFSI, he has no specific knowledge about any development plans of single wafer wet processing equipment. (Id.)

The Court is not persuaded, based on the record before it, that the micro-lithography and surface conditioning equipment sold by Solid State and FSI are truly competitive. The price factor and the differences between the groups of customers who buy Solid State's equipment and FSI's equipment are significant and have not been adequately addressed by FSI.[8] With respect to FSI's developing product line, the Court notes that the Agreement defines "competing products" to include

> products and services that compete with or will compete with any product, product line, or service that is sold, marketed, produced, distributed, leased or under development by the Company with respect to which the Employee performed services of any kind or nature during the twenty-four month period ending on the date the Employee's employment with the Company ended."

(Compl. Ex. A. at 1 (emphasis added).) There is no evidence in the record that Shumway performed services of any kind relating to the single-wafer wet processor products that may be under development by FSI. Based on the record presently before it, the Court concludes that FSI is not likely to establish a breach of the non-competition and non-solicitation covenants. This factor therefore also weighs against awarding a preliminary

[8] The Court finds FSI's arguments to be analogous to an assertion that, because all automobiles have an internal combustion engine and can be used to transport people and things, a Porsche and a Yugo are directly competitive vehicles.

injunction based on the restrictive covenants in the Agreement.

## 2. Misappropriation of Trade Secrets.

FSI asserts that Shumway, in his new job for Solid State, will inevitably use or disclose information regarding FSI's customer accounts, pricing, marketing, and product formula and manufacturing and that such conduct can be enjoined under Minnesota's Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01-325C.08 ("the Act"). The Act defines misappropriation as the improper acquisition, disclosure or use of a "trade secret." Minn. Stat. § 325C.01, subd. 3. To establish that a particular item is a "trade secret" under the Act, FSI bears the burden of proving that (1) the information is not generally known or readily ascertainable, (2) the information derives independent economic value from secrecy, and (3) the plaintiff makes reasonable efforts to maintain the information's secrecy. See NewLeaf Designs, L.L.C. v. BestBins Corp., 168 F. Supp. 2d 1039, 1043 (D. Minn. 2001) (Tunheim, J.); Lexis-Nexis v. Beer, 41 F. Supp. 2d 950, 958 (D. Minn. 1999) (Doty, J.). Furthermore, to obtain an injunction under the Act, FSI must demonstrate "a high degree of probability of inevitable disclosure." Lexis-Nexis, 41 F. Supp. 2d at 958 (quoting International Bus. Machines Corp. v. Seagate Tech., Inc., 941 F. Supp. 98, 101 (D. Minn. 1992) (Magnuson, C.J.)). "Merely possessing trade secrets and holding a comparable position with a competitor does not justify an injunction." IBM Corp., 941 F. Supp. at 101.

FSI's affidavits contain the following representation:

> FSI expends substantial money and other resources developing and maintaining certain trade secrets and other confidential and proprietary information, such as customer accounts, information on prospective customers, price lists, business strategies, equipment design, product information, and other confidential business information. This information is very valuable to FSI and is the source of any competitive advantage FSI may have in the marketplace. FSI does not provide access to its trade secrets to the general public, non-employees, or anyone not subject to an Employment Agreement.

(Malis Aff. ¶ 5; Becker Aff. ¶ 4.) Malis further avers that, while Shumway worked for FSI, he was entrusted "with numerous trade secrets and other confidential and proprietary information as a necessary component of his sales position," including "valuable customer, pricing, marketing, and product formula and manufacturing information that is not generally known to FSI's competitors." (Malis Aff. ¶ 19.) FSI does not describe the "valuable information" in any further detail.

The Court cannot conclude, from the record before it, that the broad categories of information identified in the affidavits of Messrs. Malis and Becker constitute "trade secrets" under the Act. FSI has not described any specific information regarding customers, pricing, marketing, product formula, and product manufacturing that satisfies the statutory definition of a "trade secret." Indeed, it seems logical that some information regarding the price and specifications of products must be disclosed to the public in order to sell the products. Nor has FSI shown that, within these broad categories of "valuable information," Shumway has detailed knowledge of facts that are not generally known or otherwise readily ascertainable. Given FSI's lack of specificity in identifying what is a

trade secret, it is impossible for the Court to fashion a meaningful injunction that would not overly restrict legitimate competition. See Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 898 (Minn. 1983).

Shumway also observes that the Agreement allows FSI's employees to decide whether to disclose "confidential information" on a "need-to-know" basis to third persons who are not required by the employee to sign a confidentiality agreement.[9] FSI has not adequately addressed this exception to the confidentiality provisions of the Agreement. Such discretion to disclose confidential information calls into serious question whether FSI in fact exercises reasonable efforts to maintain the secrecy of its "trade secrets."

The Court concludes that FSI has not sustained its burden of showing a likelihood of success on the merits of its trade secrets claim. This conclusion is not intended to provide any opinion as to the ultimate merits of FSI's claim. The Court reaches this conclusion based upon the limited record available in these early stages of the proceeding. Discovery may produce new or additional facts that could change FSI's likelihood of success on the merits.

**B. The Remaining Dataphase Factors**

Having concluded that FSI has not met its burden of establishing a likelihood of

---

[9] "[I]n the scope of his/her employment with FSI, Employee may, in furtherance of the Company's business interests, communicate Confidential Information or Customer Information to other responsible Company personnel, Customers, and other persons or entities with whom or which the Company has dealings, who have a need to know such information." (Compl. Ex. A ¶ 2(b).)

success on the merits of its claims, the remaining factors may be dealt with briefly. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies. Thus, to warrant . . . preliminary [injunctive relief], the moving party must demonstrate a sufficient threat of irreparable harm." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)); Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 371 (8th Cir. 1991); see also In re Travel Agency Commission Antitrust Litig., 898 F. Supp. 685, 689 (D. Minn. 1995) (Rosenbaum, J.). Because FSI has not met its burden with respect to success on the merits of its breach of restrictive covenant and misappropriation of trade secrets claims, the Court cannot infer that FSI will incur irreparable harm unless Shumway is enjoined from working for Solid State. See Lexis-Nexis, 41 F. Supp. 2d at 959. In light of that conclusion, the balance of harms favors Shumway, who would experience the immediate loss of his livelihood if he were enjoined from working for Solid State. Finally, based upon the record before the Court, it is clearly not in the public interest to award FSI an injunction pending trial; as noted above, Minnesota law looks with disfavor on restrictive covenants as partial restraints on trade. FSI appears to have little likelihood of success in establishing that the restrictive covenants are valid, and enjoining Shumway based on the slender misappropriation of trade secrets claim presented on this record would essentially create an ex post facto restrictive covenant, contrary to public policy in Minnesota.

## CONCLUSION

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that Plaintiff FSI International, Inc.'s Motion for a Preliminary Injunction or, in the Alternative, Temporary Restraining Order (Doc. No. 2) is **DENIED.**

Dated: February 26, 2002

RICHARD H. KYLE
United States District Judge